[Crim. No. 6050. In Bank. Nov. 19, 1957.]

THE PEOPLE, Respondent, v. VELVA IRENE McCAUGHAN, Appellant.

Sutter & Carter and Douglas M. Sutter for Appellant.

Edmund G. Brown, Attorney General, Doris H. Maier and John Fourt, Deputy Attorneys General, for Respondent.

TRAYNOR, J.—A jury found defendant guilty of involuntary manslaughter (Pen. Code, § 192, subd. 2), and the court denied her motion for a new trial. Judgment was suspended, and defendant was admitted to probation for a term of three years on the condition that she serve one year in a county detention facility. Defendant appeals.

Defendant was a psychiatric technician at the state hospital in Modesto in charge of a ward of 50 mental patients. One of the patients in defendant's ward was Grace Belill, a 71-year-old woman suffering from involutional psychosis, a mental condition that commonly causes a patient to refuse to eat. On October 12, 1955, a doctor at the hospital noted in Miss Belill's record that if necessary she was to be spoon fed. On October 14, 1955, at the noon meal, Miss Belill was not eating, and defendant spoon fed her. During the feeding the patient collapsed and shortly thereafter died. The cause of death was asphyxiation from the aspiration of stomach contents.

The gravamen of the charge against defendant is that she used improper methods and excessive force in spoon feeding the decedent. The People sought to prove that defendant's conduct constituted either criminal negligence or a misdemeanor and that the misdemeanor consisted of a violation of either section 242 (battery) or section 361 (treatment of insane persons) of the Penal Code. The jury was given in-

structions appropriate to each of the People's theories, including an instruction in the statutory language of section 361, and returned a general verdict of guilty.

Defendant contends that the provisions of section 361 are so vague and uncertain that her conviction thereunder is a denial of due process of law. ■ "[A] statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application violates the first essential of due process of law." (*Connally* v. *General Const. Co.,* 269 U.S. 385, 391 [46 S.Ct. 126, 70 L.Ed. 322]; *Lanzetta* v. *New Jersey,* 306 U.S. 451, 453 [59 S.Ct. 618, 83 L.Ed. 888]; *In re Peppers,* 189 Cal. 682, 685-687 [209 P. 896].) ■ A statute must be definite enough to provide a standard of conduct for those whose activities are proscribed as well as a standard for the ascertainment of guilt by the courts called upon to apply it. (*Winters* v. *New York,* 333 U.S. 507, 515-516 [68 S.Ct. 665, 92 L.Ed. 840]; *In re Peppers, supra,* 189 Cal. at 685-687; *People* v. *Building Maintenance etc. Assn.,* 41 Cal.2d 719, 725 [264 P.2d 31]; *People* v. *Saad,* 105 Cal. App.2d Supp. 851, 854 [234 P.2d 785].) ■ A statute will be upheld if its terms may be made reasonably certain by reference to the common law (see *Connally* v. *General Const. Co., supra,* 269 U.S. at 391; *Lorenson* v. *Superior Court,* 35 Cal.2d 49, 60 [216 P.2d 859]) or to its legislative history or purpose. (See *Connally* v. *General Const. Co., supra,* 269 U.S. at 391-392; *People* v. *King,* 115 Cal.App.2d Supp. 875, 878 [252 P.2d 78].) ■ A statute will likewise be upheld, despite the fact that the acts it prohibits are defined in vague terms, if it requires an adequately defined specific intent. (See *People* v. *Building Maintenance etc. Assn., supra,* 41 Cal. 2d at 724 and cases cited.) ■ A court, however, may not create a standard (*Lanzetta* v. *New Jersey, supra,* 306 U.S. 451; *Connally* v. *General Const. Co., supra,* 269 U.S. 385), and a specific intent defined in the same vague terms as those defining the prohibited acts does not make a statute acceptably definite.

■ Section 361 provides: "Every person guilty of any harsh, cruel, or unkind treatment of, or any neglect of duty towards, any idiot, lunatic, or insane person is guilty of a misdemeanor." The phrase "neglect of duty" has an accepted legal meaning. It means an intentional or grossly negligent failure to exercise due diligence in the performance of a known official duty. (See *Rapaport* v. *Civil Service Com.,*

134 Cal.App. 319, 323-324 [25 P.2d 265]; *M. F. Kemper Const. Co.* v. *City of Los Angeles,* 37 Cal.2d 696, 702 [235 P.2d 7]; *People* v. *Perkins,* 85 Cal. 509, 511 [26 P. 245]; *Reinhard* v. *Lawrence Warehouse Co.,* 41 Cal.App.2d 741, 747 [107 P.2d 501].) The word "cruel" has a commonly accepted meaning. It means "[d]isposed to give pain to others; willing or pleased to hurt or afflict. . . ." (Webster's New International Dictionary, 2d ed., unabridged.) "Cruel treatment" as used in a criminal statute has been defined to mean the intentional infliction of pain for the mere purpose of causing pain or indulging vindictive passions. (*Commonwealth* v. *Lufkin,* 89 Mass. (7 Allen) 579, 581.) It appears, therefore, that if section 361 were limited to the punishment of cruel treatment of or neglect of duty towards insane persons, it would not be unconstitutionally vague. Defendant, however, directs her attack at the terms "harsh" treatment and "unkind" treatment. Webster's New International Dictionary, second edition, unabridged, defines "harsh" as "1. Offensive to sense as being coarse, rough, grating, discordant, astringent. . . . 2. Offensive to the sensibilities; disagreeable to one's feeling of aesthetic or intellectual propriety. . . . 3. Of persons or things, offensive to a sense of justice or kindness; unfeeling, severe, cruel, unduly rigorous. . . . 4. Offensive to the physical feelings; roughly unpleasant; causing physical discomfort. . . ." The same authority defines "unkind" as "[n]ot kind, esp., wanting in kindness, sympathy, or the like; hence, cruel; harsh." ▮ It is apparent from the mere recitation of the meanings ascribed to "harsh" and "unkind," most of them indefinite themselves, that men of common intelligence must necessarily guess at the meaning of these words as used in the statute and that they will differ as to their application in a specific situation. The words in question have no established common law meaning. Nor have they any adjudicated meaning. Although section 361 has been in the Penal Code since its adoption in 1872, and although the New York statute (New York Penal Code (1864), § 425), which served as the model for our code section (Rev. Laws of the State of California (1871), vol. IV, § 361, Code Commission note), contains identical language, the terms "harsh" treatment and "unkind" treatment have never been construed by an appellate court either in New York or in this state. Referring to the purpose of the statute to protect insane persons, the attorney general contends that, like "cruel" treatment, the terms "harsh"

treatment and "unkind" treatment should be limited to mean treatment likely to cause physical harm or pain. We find nothing in the statute, however, indicating that protection was meant to be limited to protection against physical harm or pain. Indeed, the use of the words "harsh" and "unkind" in addition to the word "cruel" indicates that protection was not meant to be so limited.

The trial court correctly interpreted section 361 as requiring a specific intent (see *People* v. *Vogel,* 46 Cal.2d 798, 801 [299 P.2d 850]; *People* v. *Stuart,* 47 Cal.2d 167, 173 [302 P.2d 5]) and instructed the jury that to convict defendant under that section they must find that she treated the decedent " . . . with an intent to be harsh, cruel or unkind . . . or with intent to neglect her." The requirement that defendant must have acted with an intent to be harsh or unkind, however, does not make clear what those words mean.

We conclude that the words "harsh" and "unkind" do not provide an ascertainable standard of conduct or a workable standard of guilt and that insofar as it purports, without further definition, to make "harsh" treatment and "unkind" treatment criminal offenses, section 361 of the Penal Code is void for vagueness. The court's instruction relating to section 361, given in the language of the statute, was therefore erroneous, and in view of the conflicting evidence as to the nature of defendant's acts and the general verdict, the error must be deemed prejudicial. (*Oettinger* v. *Stewart,* 24 Cal.2d 133, 140 [148 P.2d 19, 156 A.L.R. 1221]; *Huebotter* v. *Follett,* 27 Cal.2d 765, 771 [167 P.2d 193]; *Clement* v. *State Reclamation Board,* 35 Cal.2d 628, 643-644 [220 P.2d 897]; *Screws* v. *United States,* 325 U.S. 91, 106-107 [65 S.Ct. 1031, 89 L.Ed. 1495].) The orders appealed from must, therefore, be reversed. Since the reversal may result in a new trial, however, it is necessary to determine whether section 361 is valid in part and to consider several other alleged errors. (Code Civ. Proc., § 53.)

The fact that a statute is unconstitutional in part does not necessarily invalidate the entire statute. The remaining parts of the statute may be preserved if they can be separated from the unconstitutional part without destroying the statutory scheme or purpose. (*Danskin* v. *San Diego Unified Sch. Dist.,* 28 Cal.2d 536, 555 [171 P.2d 885]; *Ex parte Gerino,* 143 Cal. 412, 420 [77 P. 166, 66 L.R.A. 249].) The unconstitutional provisions relating to "harsh" and "unkind" treatment are severable from the constitutional pro-

visions relating to "cruel" treatment and "neglect of duty" and do not vitiate the whole statute. Since the dominant purpose of the statute to protect insane persons can be effected by the elimination of the severable unconstitutional provisions, the constitutional provisions may stand alone and remain in force. (*People* v. *Lewis*, 13 Cal.2d 280, 284 [89 P.2d 388].) We conclude, therefore, that insofar as it provides that any person guilty of any ". . . cruel . . . treatment of, or any neglect of duty towards any idiot, lunatic, or insane person . . ." is guilty of a misdemeanor, section 361 is a valid statute.

Defendant contends that as a matter of law the evidence that the decedent's death was caused by an act of defendant does not support her conviction. The evidence viewed most favorably to respondent discloses that defendant fed the decedent three tablespoons of cubed, creamed potatoes. She held the decedent's head back by grasping her hair with one hand and fed her with the other. At intervals during the feeding defendant covered the decedent's mouth and nose with a towel. Another attendant was holding the decedent's arms, and at some time during the feeding or immediately thereafter a hospital inmate sat on the decedent's lap. At some time during the feeding the decedent wiggled her legs. After the third spoon of food was put into her mouth the decedent collapsed. Efforts to revive her failed, and shortly thereafter she died. Dr. Miller, who performed the autopsy, testified that she found lodged in the decedent's trachea and bronchi three to four tablespoons of partially digested food, white in color and creamy in substance. The cause of death was established as asphyxiation from the aspiration of stomach contents. Dr. Miller testified that no food was found in the decedent's stomach and explained on cross-examination that the decedent must have swallowed the food as it was fed, regurgitated, and then aspirated the regurgitated matter. At the time of her death, the decedent was suffering from chronic inflammation of the gall bladder with stone formation, and a quantity of "bile-tinged" liquid, characteristic of a gall bladder attack, was found in her stomach. Decedent also had coronary arteriosclerosis; the inside diameter of the anterior descending branch of the left coronary was reduced in size to that of a pin point.

It is defendant's contention that there is no proof whatever that any act of hers caused the decedent to regurgitate and

aspirate the stomach contents and that, on the contrary, there is evidence that these events were not caused by defendant's acts. The district attorney asked Dr. Miller the following hypothetical question:

"If a person is sitting on a chair, and her head is held back by the hair of her head so that her face is looking up towards the ceiling—also, her arms are being held, and another person is sitting on her lap—and then an amount of food is placed into the person's mouth, and she is resisting the food—and then a towel is placed over her mouth and her nose is also being held for a period of time, and then the person slumps over and thereafter expires, and approximately four heaping tablespoons of food is found lodged in the trachea; now, Doctor, based upon this hypothetical question, what would be the cause of death, Doctor?"

Defendant objected to the question on the ground that it omitted a material fact in evidence, namely that the food found in the decedent's trachea was partially digested. The court overruled the objection, and Dr. Miller answered, "The cause of death would be due to asphyxia, caused by obstruction of the trachea with food." The objection should have been sustained. The undisputed evidence was that the food was partially digested. This fact was essential to a consideration of causation, for it showed that the food had been in the stomach and must have been regurgitated and that, therefore, it was not aspirated directly as it was put into the decedent's mouth.

It is obvious that the hypothetical question and Dr. Miller's answer did not advance the inquiry into what caused the decedent to regurgitate and aspirate her stomach contents. Dr. Miller had previously testified to the cause of death. Her answer to the hypothetical question merely repeated that testimony, and her answer was obviously based on only two of the facts in the question, namely that the decedent died and that approximately four tablespoons of food were found lodged in her trachea. On cross-examination Dr. Miller testified that she did not know what caused the decedent to regurgitate, that it was possible that either the decedent's heart condition or her gall bladder condition could have caused it, but that she thought these possibilities improbable. Dr. Toller, a defense witness, was presented with the same hypothetical set of facts presented to Dr. Miller. It was his opinion that none of the circumstances disclosed therein, either singly or collectively, could have caused the decedent to regurgitate

and aspirate her stomach contents. He testified that it was possible that the regurgitation might have been caused by the decedent's heart condition or gall bladder condition. He suggested as a third possibility that the regurgitation might have been caused by the decedent's revulsion because of her mental condition to the thought of eating.

Thus, the testimony of the expert witnesses supports defendant's contention. If the jury rejected the opinion evidence, however, they could infer that the manner in which the decedent was fed was at least a contributing cause of her regurgitation or that, even if the regurgitation was not caused by an act of defendant, her placing the towel over the decedent's mouth and nose preventing the vomitus from escaping was the cause of the decedent's aspirating the regurgitated matter. The latter inference is weakened by the fact that neither the time at which the decedent regurgitated nor the time at which the' towel was held over her mouth and nose was established and also by the fact that it was not shown that the vomitus ever came high enough into the throat to be expelled through the mouth. We cannot say as a matter of law, however, that either of these inferences is unreasonable.

Defendant contends that the court erred in qualifying as competent witnesses several mental patients in the state hospital at Modesto. All of these patients were in the ward over which defendant had supervision, and some of them had histories of insane delusions relating to food and to persecution by hospital personnel. Much of the evidence most damaging to defendant is in the testimony of these patients. We deem it unnecessary to discuss the witnesses individually, for their testimonial qualifications may be changed at the time of a new trial and would have to be reexamined at that time. Our review of the record, however, indicates the desirability of our reviewing the rules governing the qualifications of an insane person as a witness.

Section 1321 of the Penal Code provides, with exceptions with which we are not here concerned, that the rules for determining the competency of witnesses in civil actions apply also to criminal actions. ▮▮ Section 1880 of the Code of Civil Procedure provides: "The following persons cannot be witnesses. 1. Those who are of unsound mind at the time of their production for examination. . . ." This section, however, does not impose an absolute disqualification on insane persons. As was said in *People* v. *Tyree*, 21 Cal.App. 701, 706 [132 P. 784], "The statute does not undertake to prescribe or define

the amount or degree of mental unsoundness that must exist in order to disqualify the witness, but the reason for the existence of such a statute should be invoked, and we interpret that reason to require that the witness should have some apprehension of the obligation of an oath, and that he shall be capable of giving a fairly correct account of the things he has seen or heard, and this test should be made with special reference to the field of inquiry and character of the subject on which the witness is to give testimony.''

The question to be determined is whether the proposed witness's mental derangement or defect is such that he was deprived of the ability to perceive the event about which he is to testify or is deprived of the ability to recollect and communicate with reference thereto. (*People* v. *Ives,* 17 Cal. 2d 459, 476 [110 P.2d 408]; *People* v. *Harrison,* 18 Cal.App. 288, 294 [123 P. 200]; see Wigmore on Evidence, 3d ed., vol. 2, §§ 493-495, pp. 586-587.) It bears emphasis that the witness's competency depends upon his *ability* to perceive, recollect, and communicate. (See Wigmore on Evidence, *supra,* § 478, p. 519.) Whether he did perceive accurately, does recollect, and is communicating accurately and truthfully are questions of credibility to be resolved by the trier of fact.

The language of section 1880 is addressed to the time at which a witness is produced for examination, and there is language in several cases suggesting that insanity at the time of the event witnessed is not a matter for consideration in the determination whether or not a proposed witness is competent to testify. (See *People* v. *Harrison, supra,* 18 Cal.App. at 296; *People* v. *Tyree, supra,* 21 Cal.App. at 706-707; *McComb* v. *Atchison etc. Ry. Co.,* 110 Cal.App. 303, 307-308 [294 P. 81]; *People* v. *Mendez,* 193 Cal. 39, 48-49 [223 P. 65]; *People* v. *Curry,* 97 Cal.App.2d 537, 541-542 [218 P.2d 153].) The rule is to the contrary. It is apparent from the requirement that the witness have the ability to give a substantially accurate account of the event witnessed (*People* v. *Tyree, supra,* 21 Cal.App. at 706-708 and cases there cited; *People* v. *Ives, supra,* 17 Cal.2d at 476) that he must have had the ability to perceive the event with a substantial degree of accuracy. Moreover, section 1879 of the Code of Civil Procedure requires as a general testimonial qualification the ability to perceive the event about which testimony is to be given. (See also Wigmore on Evidence, *supra,* §§ 492-493, p. 586; *Bradburn* v. *Peacock,* 135 Cal.App.2d 161, 164 [286 P.2d 972], construing Code Civ. Proc., § 1880, subd. 2; Code Civ. Proc.,

§ 1845.) It follows that if the proposed witness was suffering from some insane delusion or other mental defect that deprived him of the ability to perceive the event about which it is proposed that he testify, he is incompetent to testify about that event. Any implication to the contrary in the foregoing cases is disapproved.

 It is universally recognized that the competency of a witness is to be determined by the trial court in the exercise of its judicial discretion. (*People* v. *Ives, supra,* 17 Cal.2d at 476; *People* v. *Harrison, supra,* 18 Cal.App. at 295; see McCormick on Evidence, p. 123.) Manifestly, however, sound discretion demands the exercise of great caution in qualifying as competent a witness who has a history of insane delusions relating to the very subject of inquiry in a case in which the question is not simply whether or not an act was done but, rather, the manner in which it was done and in which testimony as to details may mean the difference between conviction and acquittal.

Defendant contends that the court erred in allowing two prosecution witnesses to testify, over defendant's objections, that defendant used improper methods and excessive force in feeding the decedent the morning meal on the day of her death and on several other occasions. Defendant contends that the only purpose of this evidence was to prejudice the jury against her and that it should have been excluded.

 "It is settled in this state that except when it shows merely criminal disposition, evidence which tends logically and by reasonable inference to establish any fact material for the prosecution, or to overcome any material fact sought to be proved by the defense, is admissible although it may connect the accused with an offense not included in the charge." (*People* v. *Woods,* 35 Cal.2d 504, 509 [218 P.2d 981].)
 In determining whether such evidence is relevant to prove a material fact and not just criminal disposition, the trial court should be guided by the rule that "such proof is to be received with 'extreme caution,' and if its connection with the crime charged is not clearly perceived, the doubt is to be resolved in favor of the accused, instead of suffering the minds of the jurors to be prejudiced by an independent fact, carrying with it no proper evidence of the particular guilt." (*People* v. *Albertson,* 23 Cal.2d 550, 577 [145 P.2d 7]; see also *People* v. *Peete,* 28 Cal.2d 306, 316 [169 P.2d 924].) If such evidence is determined to be relevant to prove a material fact in issue, it is for the trial court in the exercise of its

judicial discretion to determine whether its probative value is outweighed by its possible prejudicial effect and to admit or exclude it accordingly, for "[t]his is a situation where the policy of protecting a defendant from undue prejudice conflicts with the rule of logical relevance, and a proper determination as to which should prevail rests in the sound discretion of the trial court, and not merely on whether the evidence comes within certain categories. . . ." (*State* v. *Goebel,* 36 Wn.2d 367 [218 P.2d 300, 306]; see also *Adkins* v. *Brett,* 184 Cal. 252, 258-259 [193 P. 251]; Jackson, J., in *Michelson* v. *United States,* 335 U.S. 469, 475-476 [69 S.Ct. 213, 93 L.Ed. 168]; Stone, *Exclusion of Similar Fact Evidence,* 46 Harv. L. Rev. 954, 984-985; McCormick on Evidence (1954), § 157, pp. 332-333.)

The People were attempting to prove that defendant was guilty of a willful and unlawful use of force upon the person of the decedent. (Pen. Code, § 242, *supra.*) Defendant's intent was clearly in issue, and her treatment of the decedent on other occasions was relevant to prove the nature of her relations with the decedent and her intent at the time of the offense charged. (*People* v. *Palassou,* 14 Cal.App. 123, 126-127 [111 P. 109]; *People* v. *Wells,* 33 Cal.2d 330, 341-342 [202 P.2d 53].) We find no abuse of discretion in the trial court's admitting the testimony to which defendant objects.

 Defendant also contends that the trial court erred in excluding from evidence coroner's verdicts relating to six other deaths from the aspiration of stomach contents, which occurred at the state hospital at Modesto in 1955. Defendant sought to show by these records that the other deaths occurred naturally and to prove thereby that this decedent's death was not caused by any act of defendant. The court did permit defendant to adduce testimony that mental patients suffering from involutional melancholia are predisposed to regurgitation and that the records of the Stanislaus County coroner's office disclosed six deaths in the county in 1955 from the aspiration of stomach contents, all of them occurring at the state hospital in Modesto. The court excluded the coroner's verdicts, however, on the grounds that their admission would involve inquiry into an excessive number of collateral issues, namely the circumstances surrounding each death. It was for the trial court to determine whether the probative value of the offered evidence was outweighed by the necessity of inquiring into collateral issues. (Code Civ. Proc., § 1868.) We find no abuse of discretion in the exclusion of the coroner's verdicts.

Other alleged errors and defendant's contention that the district attorney was guilty of misconduct need not be considered, since the occurrences complained of are not likely to attend a new trial.

The orders denying a new trial and admitting defendant to probation are reversed.

Gibson, C. J., Shenk, J., Carter, J., Schauer, J., Spence, J., and McComb, J., concurred.