[Crim. No. 15346. Fourth Dist., Div. One. Aug. 28, 1984.]

THE PEOPLE, Plaintiff and Respondent, v.
MARTIN CHARLES LYNN, Defendant and Appellant.

COUNSEL

Lynda A. Romero, under appointment by the Court of Appeal, for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Keith I. Motley and Jay M. Bloom, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

DUFFY, J.*—A jury found Martin Charles Lynn guilty of first degree murder (Pen. Code,[1] §§ 187, 189) and acquitted him of robbery (§ 211). Lynn

---

*Assigned by the Chairperson of the Judicial Council.

[1]All statutory references are to the Penal Code unless otherwise specified.

admitted he had a prior violent felony conviction for robbery (§ 667.5, subd. (b)). He appeals after the trial court sentenced him to prison for the term prescribed by law, 26 years to life.

On January 16, 1982, Lynn killed Gary Williams by strangling him with his hands, a tightly knotted garrote and by stomping on Williams' neck. In the morning before his death, Williams went to the Vista residence of Ingrid Gambrell and Janice Campbell and said he wanted to buy some cocaine. Williams was intoxicated from drugs or alcohol and Janice Campbell had him leave. Lynn arrived at the residence about one hour later with Robert Morgan and was informed of Williams' desire to buy some form of narcotics. Both Lynn and Morgan appeared to be sober although they both had used heroin and alcohol that morning. Campbell, concerned about narcotics trafficking at the house, told Lynn and Morgan she did not want them there. Lynn was angry. He went outside where Williams waited and asked him why he was looking for him when he did not know him, then said he wanted to see how tough Williams was and struck Williams in the head. Williams said he wanted no trouble and walked away.

A few minutes later, Lynn and Morgan drove away from the Campbell residence and met Williams in a nearby parking lot. Lynn told Morgan to stop the car so he could apologize to Williams. Morgan stopped and Lynn told Williams to come over to the car. Lynn then apologized to Williams and asked him what he wanted. Williams said he wanted a $50 bag of heroin. Lynn offered Williams a ride and said he would talk about it. Williams accepted the offer for a ride. Lynn got out of the car to let Williams be seated in the middle of the seat between Morgan and himself. As they drove through Vista, Lynn and Williams discussed getting drugs for Williams. After two or three minutes, Lynn started asking Williams why he was coming there looking for him when he did not know him. Williams did not answer Lynn. On the outskirts of Vista, using his hands squeezing the front part of Williams' neck, Lynn began strangling Williams who tried to push Lynn away without success. About a mile after the strangling began, Morgan stopped the car, pulled Lynn and Williams out of the car and told Lynn to quit the strangling. Lynn stopped strangling Williams but threw him against the car. Then the three reentered the car with Williams again in the middle of the seat. Lynn said to Morgan, "Let's take this punk and drop him out wherever he wants to go."

Morgan turned the car around and headed for a gas station. On the way, Lynn seemed somewhat calmed but, at the station as Morgan was putting in gas, he saw Lynn strangling Williams again. Williams again tried unsuccessfully to push Lynn away. After this strangling had lasted two to three minutes, Morgan banged on the windshield and told Lynn to stop. Lynn

stopped, but when Morgan reentered the car, he found Williams slumped over in his seat. Morgan could not find any pulse in Williams' wrist.

Lynn told Morgan to drive out to "the boonies" where they could get rid of the body. Morgan drove out East Vista Way to Highway 76. On the way, Lynn resumed strangling Williams, though he stopped three or four times to rest his hands. At one point, Lynn said "this guy don't want to die," and at another time he told Morgan not to get scared if the body started jumping all around. Williams was not resisting this strangling session which lasted 10 to 15 minutes before Morgan stopped the car. A retracing of the route from the gas station to where the car stopped took 13½ minutes.

At their destination in a remote area near Bonsall, Lynn pulled Williams out of the car and ordered Morgan to get something out of the back of the car to tie around Williams' neck so he could make sure Williams was dead. Morgan found a cord and gave it to Lynn. Lynn wrapped the cord tightly around Williams' neck three times and told Morgan to hold the cord so he could knot it. Morgan, afraid of Lynn, complied and Lynn told him now Morgan could not say he had nothing to do with the murder. Lynn then stood on Williams' neck with both feet and bounced up and down on his throat. Lynn again explained he wanted to make sure Williams was dead. Lynn went through Williams' pockets and took $5 and his wallet. Lynn ripped off Williams' shirt and covered him with brush. Lynn and Morgan then left. On the way back to the residence of Campbell, Lynn disposed of Williams' shirt and tore up identification cards found in the wallet.

Morgan and Lynn returned to the Campbell residence around 5 p.m. Morgan was very quiet compared to his argumentative nature earlier in the day. Morgan sat on a couch and said nothing. Lynn was covering the front of his head with his shirt and said he had been in a fight. The next day, Campbell saw Lynn had abrasions on his head.

Campbell saw Morgan the next evening. Morgan was very upset and told Campbell that Lynn had involved him in something very bad and she and Gambrell should get Lynn out of the house. When Campbell asked Morgan if it was murder, he hung his head and cried, explaining he would not say because he did not want to involve Campbell.

Later at the house, Lynn asked Campbell what another person had meant by saying Lynn was implicated in a murder. When Campbell said she did not know, Lynn responded, "[l]ook, if I was ever to murder somebody, I wouldn't leave a witness."

When homicide Detective Craig Henderson examined Williams' body at about 5:30 p.m. on January 16,[2] it was not completely cold to the touch, indicating it had not been dead very long. Medical evidence could not establish the time of Williams' death, though it appeared he died within 15 to 30 minutes of the onset of his bruises on his neck and it was possible he was alive when the cord was placed around his neck. Neither was it determined whether the asphyxiation was due to strangulation by hand or by being stepped on. Each of the three methods of strangulation would cause extreme pain.

Lynn admitted the strangling and testified he felt threatened by Williams although Williams neither verbally nor physically threatened him. Lynn said he did not know why, but he hated Williams and wanted him to die. He intended to inflict pain on Williams although he thought he was dead. He put the rope around Williams' neck "just to choke him." On the other hand, he did not believe Williams deserved to die, he just wanted finality. When he had covered Williams' body, he knew what had happened, he had killed Williams.

Lynn said he had drunk a half pint of vodka and a quart of vodka within six hours of the killing, but he had not taken heroin on that day. He was attending a methadone center for alcohol abuse.

A defense expert opined Williams was dead when Lynn placed the cord around his neck but he acknowledged Williams could have been clinically dead and survive up to 13½ more minutes.

In rebuttal, the prosecution presented evidence Lynn was sober on the day of the killing and Lynn would have been unconscious with a .72 blood alcohol level had he consumed the amount of alcohol he claimed to have ingested.

Lynn's surrebuttal consisted of further evidence Lynn had a diminished mental state from intoxication at the time of the crime.

I

Lynn contends there was insufficient evidence to support first degree murder on the theory either it was a premeditated and deliberated killing or it was a murder by torture.[3]

---

[2]Hunters found Williams' body and notified the sheriff.

[3]Aside from the two mentioned theories for first degree murder, the case was tried on the theory it was a first degree felony murder based on robbery. Lynn asserts that because the jury acquitted him of the robbery, we should consider only the former two theories in light of the evidence. The Attorney General, by not addressing the felony murder theory, apparently adopts Lynn's view of the verdicts and approach to the case. We proceed on this basis.

Section 189 provides in pertinent part: "All murder which is perpetrated by means of . . . torture, or by any other kind of willful, deliberate, and premeditated killing, . . . is murder of the first degree; and all other kinds of murders are of the second degree.

". . . . . . . . . . . . . . . . . . . . .

"To prove the killing was 'deliberate and premeditated,' it shall not be necessary to prove the defendant maturely and meaningfully reflected upon the gravity of his or her act."

## A

On the wilful, deliberate and premeditated form of first degree murder, the California Supreme Court has set forth the appropriate view of the evidence as follows: "The type of evidence which this court has found sufficient to sustain a finding of premeditation and deliberation falls into three basic categories: (1) facts about how and what defendant did *prior* to the actual killing which show that the defendant was engaged in activity directed toward, and explicable as intended to result in, the killing—what may be characterized as 'planning' activity; (2) facts about the defendant's *prior* relationship and/or conduct with the victim from which the jury could reasonably infer a 'motive' to kill the victim, which inference of motive, together with facts of type (1) or (3), would in turn support an inference that the killing was the result of 'a preexisting reflection' and 'careful thought and weighing of considerations' rather than 'mere unconsidered or rash impulse hastily executed' (*People* v. *Thomas, supra,* 25 Cal.2d 880, at pp. 898, 900, 901 [156 P.2d 7]); (3) facts about the nature of the killing from which the jury could infer that the *manner* of killing was so particular and exacting that the defendant must have intentionally killed according to a 'preconceived design' to take his victim's life in a particular way for a 'reason' which the jury can reasonably infer from facts of type (1) or (2).

"Analysis of the cases will show that this court sustains verdicts of first degree murder typically when there is evidence of all three types and otherwise requires at least extremely strong evidence of (1) or evidence of (2) in conjunction with either (1) or (3). . . ." (*People* v. *Anderson* (1968) 70 Cal.2d 15, 26-27 [73 Cal.Rptr. 550, 447 P.2d 942].)

Lynn argues there is no strong evidence fitting within any of these categories.

We point out initially the *Anderson* rule refers to a showing of "extremely *strong* evidence" (italics added) only with reference to the first category,

planning activity. Otherwise, the law requires "substantial evidence" of all three types of evidence, or of type two evidence, motive, in conjunction with either type one evidence, planning activity, or with type three evidence, manner of killing. ■ "When the sufficiency of the evidence is challenged on appeal, the court must review the whole record in the light most favorable to the judgment to determine whether it contains substantial evidence—i.e., evidence that is credible and of solid value—from which a rational trier of fact could have found the defendant guilty beyond a reasonable doubt." (*People* v. *Green* (1980) 27 Cal.3d 1, 55 [164 Cal.Rptr. 1, 609 P.2d 468]; *People* v. *Johnson* (1980) 26 Cal.3d 557, 578 [162 Cal.Rptr. 431, 606 P.2d 738, 16 A.L.R. 4th 1255]; *Jackson* v. *Virginia* (1979) 443 U.S. 307, 317-320 [61 L.Ed.2d 560, 572-574, 99 S.Ct. 2781]; *In re Frederick G.* (1979) 96 Cal.App.3d 353, 362-365 [157 Cal.Rptr. 769].)

■ Under the rule stated in *Green,* we find substantial evidence of all three categories of evidence described in *Anderson* to support a first degree murder conviction based on premeditation and deliberation.

Planning activity directed toward and explicable as intended to result in the killing consisted of Lynn's causing Morgan to intercept Williams in the parking lot as he was walking away after the encounter, to set Williams at ease with the words of apology and to lure Williams into the middle seat of the car where he could not easily escape. Soon after Lynn's second strangulation effort left Williams apparently though not necessarily unconscious, Lynn further planned for an assured termination to Williams' life in the relatively isolated confines of "the boonies" to which Lynn instructed Morgan to drive.

Motive is to be found in Lynn's status as a penniless drug dealer and user in contrast to Williams' expressed purpose of being at the Campbell residence to buy $50 worth of heroin. Lynn could get money to carry on with his drug activities. Lynn's single-minded interest in extracting from Williams a reason for his presence at the residence looking for Lynn when he did not even know him also suggests a motive, to do away with a stranger who knew of Lynn's drug activities.

The manner of killing here was clearly particular and exacting, showing Lynn must have intentionally killed according to a preconceived design to take Williams' life in a particular way. Lynn applied three forms of strangulation to deprive Williams of breath and life. Over the rather extended period of time, a minimum of 13 minutes of hand strangulation alone, Lynn was undeterred by Morgan's efforts to stop the hand strangulation or the tiredness of Lynn's own hands. Despite interruptions, Lynn resumed his strangulation by hand. Then in separate acts, he garroted Williams and

bounced on his throat. Surely, there was strong evidence of a particular and exacting method of dealing death to Williams.

In this connection, Lynn emphasizes the fact Williams was unknown to Lynn before Lynn encountered him outside the Vista residence and the shortness of time and relationship before the killing activity began. We need only observe in this regard the law does not undertake "to measure in units of time the length of the period during which the thought must be pondered before it can ripen into an intent which is truly deliberate and premeditated" (*People* v. *Thomas* (1945) 25 Cal.2d 880, 900 [156 P.2d 7]). Such premeditation may be instantaneous (*People* v. *Hashaway* (1945) 67 Cal.App.2d 554, 573 [155 P.2d 101]; *People* v. *Holt* (1944) 25 Cal.2d 59, 84 [153 P.2d 21]). There was substantial evidence from which the jury could reasonably conclude Lynn committed a wilful, deliberate and premeditated, and thus first degree, murder beyond a reasonable doubt.

## B

 Lynn argues the requirements of a torture murder are not met by sufficient evidence. For a first degree murder by torture, there must be independent proof beyond a reasonable doubt the crime was murder, i.e., an unlawful killing with malice aforethought (*People* v. *Dillon* (1983) 34 Cal.3d 441, 465 [194 Cal.Rptr. 390, 668 P.2d 697]) and there must be a similar degree of proof of a cold-blooded, calculated intent to inflict extreme and prolonged pain for the purpose of revenge, extortion, persuasion, or for any sadistic purpose (*People* v. *Wiley* (1976) 18 Cal.3d 162, 173, fn. 4 [133 Cal.Rptr. 135, 554 P.2d 881]; *People* v. *Tubby* (1949) 34 Cal.2d 72, 77 [207 P.2d 51]).

 Viewing the evidence in the light most favorable to the judgment, as we must (*People* v. *Johnson, supra,* 26 Cal.3d 557, 578), it is proper to conclude Williams was alive and not totally unconscious when Lynn applied the last phases of strangulation. Support for this conclusion is found in the medical testimony concerning the time of death and Lynn's own statement, made after Morgan could find no pulse, about Williams not wanting to die and his explanation about making sure Williams was dead as he carried out the last two forms of strangulation.

Not only do the facts of this prolonged and varied strangulation support the requisite intent for a torture murder, Lynn himself also testified at one point he intended to inflict pain on Williams. Expert medical testimony established each of the three methods of strangulation would cause extreme pain. Accordingly, substantial evidence supports the view Lynn had a cold-blooded, calculated intent to inflict extreme and prolonged pain.

That this intent encompassed a purpose of satisfying a sadistic propensity on Lynn's part is shown by the extended duration and complex methodology of the strangulation in the context in which it was done. An absolute minimum of 13 minutes of strangulation by hand occurred, a large amount of which was while Williams gave no resistance. From the beginning of the encounter, Williams said he wanted no trouble and tried to leave. Yet Lynn developed hatred for Williams and wanted to inflict pain on him and make him die. This is sadistic in the extreme. Moreover, while Williams remained in the nonresisting posture, Lynn went ahead and applied the garroting and stomping techniques.[4] "The murderer who exhibits 'the cold-blooded intent to inflict pain for personal gain or satisfaction' may not assert the victim's condition as a fortuitous defense to his own deplorable acts." (*People* v. *Wiley, supra,* 18 Cal.3d 162, 173; quoting in part from *People* v. *Steger* (1976) 16 Cal.3d 539, 546 [128 Cal.Rptr. 161, 546 P.2d 665, 83 A.L.R.3d 1206].)

There was substantial evidence of Lynn's having killed Williams with the requisite intent to torture and with malice aforethought.

## II

Lynn next contends his conviction must be reversed because the instructions regarding torture murder were confusing, incomplete and in error.

## A

First, he argues it was prejudicial error to instruct the jury motive is not an essential element of torture murder (CALJIC No. 2.51).[5] The trial court also instructed the jury in the language of the standard torture murder instruction, CALJIC No. 8.24, as follows: "Murder which is perpetrated by torture is murder of the first degree. The essential elements of such murder are the act or acts which cause the death must involve a high degree of probability of death, and the defendant must commit such act or acts with

---

[4]The duration and variety of strangulation in Lynn's case distinguishes his situation from that in cases where it is stated murder by strangulation indicates malice, but it does not by itself indicate an intent to make the victim suffer (*People* v. *Caldwell* (1955) 43 Cal.2d 864, 869 [279 P.2d 535]; *People* v. *Bender* (1945) 27 Cal.2d 164, 177 [163 P.2d 8]). As we have seen, Lynn's intent to make Williams suffer is clearly evident here from several sources showing circumstances other than simply a murder by strangulation.

[5]The trial court instructed in the language of CALJIC No. 2.51, as follows: "Motive is not an element of the crime charged and need not be shown. However, you may consider motive or lack or motive as a circumstance in this case. Presence of motive may tend to establish guilt. Absence of motive may tend to establish innocence. You will, therefore, give its presence or absence, as the case may be, the weight to which you find it to be entitled."

the intent to cause cruel pain and suffering for the purpose of revenge, extortion, persuasion, or for any sadistic purpose.

"The crime of murder by torture does not necessarily require any proof that the defendant intended to kill the deceased, nor does it necessarily require any proof that the deceased suffered pain."

The general rule is motive is not an element of any crime. (1 Witkin, Cal. Crimes (1963) Elements of Crime, § 54 and authorities cited.) To make his argument, Lynn emphasizes the language in CALJIC No. 8.24 and similar language in certain cases which requires an intent to cause cruel pain and suffering "for the purpose of revenge, extortion, persuasion or for any sadistic purpose." This language does not elevate motive to the status of an element of torture murder. Rather, as CALJIC No. 2.51 instructs, the presence or absence of motive remains a circumstance in the case which may tend to establish guilt or innocence. CALJIC No. 8.24 simply makes explicit the treatment of motive as an element of proof in torture murder cases rather than as an element of the crime. The instruction does not change the treatment of motive from that in other first degree murder cases. (See *People* v. *Anderson, supra,* 70 Cal.2d 15, 26-27.) Thus, the trial court committed no error in instructing on motive.

## B

Lynn next asserts the instruction regarding the specific intent required for torture murder was wrong in that the intent required is to cause cruel pain and suffering and at one point the trial court said: "In the crime of first degree murder of which the defendant is accused in count 1 of the information, the necessary mental state is the existence in the mind of the defendant of premeditation, deliberation, and malice; or on the theory of murder by torture, the *specific intent to torture*; or on the theory of felony murder, the specific intent to rob. These mental states will each further be discussed in the remaining instructions." (Italics added.)

As we have seen, the court later instructed in the language of CALJIC No. 8.24 which spells out the "intent to cause cruel pain and suffering" as the mental state required in torture murder.

It is quite clear the court was merely differentiating in a general way the mental states requisite for the three forms of first degree murder on which the case had proceeded. The court was not attempting to define those mental states in any detail at that point in the instructions. CALJIC No. 8.24, as given later, covered the detail. There could be no confusion in this regard. No error resulted from the instruction giving a generalized differentiation

of the mental states involved in first degree murder theories applicable to Lynn's case.

## C

Lynn contends CALJIC No. 8.24, as given here, was misleading because it did not tell the jury it must first decide whether the crime constituted murder before deciding if it constituted torture murder, and the instructions were confusing regarding the requirement of malice aforethought. (See *People v. Dillon, supra,* 34 Cal.3d 441, 465, fn. 11, and text.)

This argument ignores the fundamental rule that all instructions must be read together and the determination whether the jury was correctly instructed is made from the entire charge of the court (see *People v. Northrop* (1982) 132 Cal.App.3d 1027, 1037-1038 [182 Cal.Rptr. 197]). The trial court fully and correctly instructed on murder and on malice.[6] It followed these instructions with others defining premeditation and deliberation, robbery and its lesser included offense, and then went into torture murder under CALJIC No. 8.24 which commences, "*Murder* which is perpetrated by torture is murder of the first degree" (italics added). It is thus clear the jury was instructed it must find a murder before it could find a torture murder. Moreover, since the jury was correctly first instructed on malice as a necessary element of murder, there could be no confusion regarding the requirement of malice aforethought in connection with the torture murder instructions.

---

[6]The instructions, as given, read: "Defendant is charged in count 1 of the information with the crime of murder, a violation of section 187 of the Penal Code. The crime of murder is the unlawful killing of a human being with malice aforethought. In order to prove the commission of the crime of murder, each of the following elements must be proved: [¶] 1. That a human being was killed. [¶] 2. That the killing was unlawful, and [¶] 3. That the killing was done with malice aforethought." (CALJIC No. 8.10.)

"Malice may be either express or implied. Malice is express when there is a manifested intention unlawfully to kill a human being. [¶] Malice is implied when the killing results from an intentional act involving a high degree of probability that it will result in death, which act is done for a base, anti-social purpose and with a wanton disregard for human life, or when the killing is a direct causal result of the perpetration or the attempt to perpetrate a felony inherently dangerous to human life.

"Robbery is a felony inherently dangerous to human life. When it is shown that a killing resulted from the intentional doing of an act with express or implied malice, no other mental state need be shown to establish the mental state of malice aforethought. [¶] The mental state constituting malice aforethought does not necessarily require any ill will or hatred of the person killed. Aforethought does not imply deliberation or the lapse of considerable time. It only means that the required mental state must precede rather than follow the act." (CALJIC No. 8.11.)

D

Lynn further contends the instruction on no need for a unanimous agreement on the theory behind the finding of first degree murder[7] implies premeditation and deliberation is not an element of torture murder by posing premeditation and deliberation as alternative theories. ■ Though Lynn relies on a statement in *People* v. *Steger, supra,* 16 Cal.3d 539, 546, to the effect torture murder requires the same proof of deliberation and premeditation as other types of first degree murder, *People* v. *Wiley, supra,* 18 Cal.3d 162, 173, in footnote 4, made it clear deliberation and premeditation were not elements of torture murder when it said: "Our use, in *Steger,* of the words 'wilful, deliberate, and premeditated intent to inflict extreme and prolonged pain,' refers only to the requirement that before the trier of fact may convict a defendant of first degree murder by torture there must be found a cold-blooded, calculated intent to inflict such pain for one of the specified purposes. Inasmuch as the Legislature has equated this state of mind with the wilful, deliberate, premeditated intent to kill that renders other murders sufficiently culpable to be classified as first degree murder, it is unnecessary in torture-murder to also find that the killing itself was 'wilful, deliberate, and premeditated.' "

Lynn's argument thus fails.

E

■ Lynn asserts the use of the word "cruel" in CALJIC No. 8.24 is also error since the term is vague. He relies on *People* v. *Superior Court (Engert)* (1982) 31 Cal.3d 797 [183 Cal.Rptr. 800, 647 P.2d 76], which struck down on vagueness and due process grounds the use of special circumstance allegations based on section 190.2, subdivision (a)(14). (*Id.,* at pp. 801-803, 806.) Subdivision (a)(14) provides: "The murder was especially heinous, atrocious, or cruel, manifesting exceptional depravity[;] as utilized in this section, the phrase especially heinous, atrocious or cruel manifesting exceptional depravity means a conscienceless, or pitiless crime which is unnecessarily torturous to the victim."

*Engert* is distinguishable from this case. *Engert* declared unconstitutional the use of the word "cruel" in the context of subdivision (a)(14) taken as a

---

[7]"THE COURT: In the crime charged in count 1, to wit: murder, it is not necessary that all jurors agree in the determination that there was a deliberate and premeditated design to take the life of the deceased or in the determination that defendant was at the time engaged in the commission of the crimes of robbery or torture, or an attempt to commit either. It is sufficient that each juror is convinced beyond a reasonable doubt that the defendant committed the crime of murder in the first degree as that offense has been defined."

whole. *Engert* did not address the constitutionality of the word "cruel" standing alone, as in CALJIC No. 8.24. Solitary use of the word "cruel" was upheld against vagueness and due process challenges in *People* v. *McCaughan* (1957) 49 Cal.2d 409, 414-417 [317 P.2d 974]. (Accord, *In re Paula P.* (1981) 123 Cal.App.3d 734, 743-746 [176 Cal.Rptr. 708]; *People* v. *Thomas* (1976) 65 Cal.App.3d 854, 856-857 [135 Cal.Rptr. 644].) Under *McCaughan,* we conclude the use of the word "cruel" in CALJIC No. 8.24 is constitutional.[8]

### F

Finally on the instructions, Lynn asserts the jury should have been instructed evidence of strangulation alone does not constitute torture as a matter of law (*People* v. *Caldwell, supra,* 43 Cal.2d 864, 869; *People* v. *Bender, supra,* 27 Cal.2d 164, 177-178). As we have noted before and under a rule Lynn cites[9] (see fn. 4, p. 727, *ante*), there were indeed other significant circumstances than simply a strangulation killing involved in his case. These circumstances remove his case from the *Bender-Caldwell* principle that strangulation by itself does not indicate an intent to make the victim suffer. Accordingly, Lynn was not entitled to this instruction.

### III

Lynn contends it is an unconstitutional deprivation of due process of law to abolish the defense of diminished capacity. Effective January 1, 1982, the Legislature did away with diminished capacity as a defense while still permitting evidence of voluntary intoxication, mental disease, mental defect, or mental disorder on the issue of whether the defendant "actually formed" the requisite mental state (§§ 22, 28). The same legislation provides that experts on mental illness, disorder or defect "shall not testify as

---

[8]*Engert* contains some broad language which could be read in a manner contrary to our conclusion. (See first full paragraph of 31 Cal.3d at p. 802.) In light of *Engert*'s holding, however, this language is dictum and thus not binding on our decision. *Engert* did not overrule *McCaughan,* but instead relied on *McCaughan* in stating the standards for its vagueness review (31 Cal.3d at p. 801). *Engert* disapproved a Court of Appeal case at odds with its holding subdivision (a)(14) of section 190.2 is unconstitutional (*id.,* at p. 806, fn. 8 and accompanying text). This suggests *McCaughan* is still good law with respect to the constitutionality of the word "cruel" standing alone. Moreover, in *People* v. *Robertson* (1982) 33 Cal.3d 21 [188 Cal.Rptr. 17, 655 P.2d 279], the Supreme Court quoted clause (2) of CALJIC No. 8.24 (containing the word "cruel") and approvingly described the instruction as having been "drafted to conform to this court's section 189 torture decisions [citations] . . . ." (33 Cal.3d at p. 51.) The absence in *Robertson* of any caveat regarding the constitutionality of the word "cruel" in CALJIC No. 8.24 suggests the Supreme Court in *Robertson* considered its concerns in *Engert* inapplicable to that instruction.

[9]Lynn states: "In cases where there has been evidence of strangulation, the torture-murder theory has only been upheld where there were other significant circumstances."

to whether the defendant had or did not have the required mental states,'' expressly leaving this decision to the trier of fact (§ 29).

The law of diminished capacity is a court-made modification of the M'Naghten insanity test born of perceived inadequacies in that test (*People* v. *Drew* (1978) 22 Cal.3d 333, 343 [149 Cal.Rptr. 275, 583 P.2d 1318]; *People* v. *Wells* (1949) 33 Cal.2d 330 [202 P.2d 53]; *People* v. *Gorshen* (1959) 51 Cal.2d 716 [336 P.2d 492]). The task of describing the circumstances under which mental incapacity will relieve a defendant of criminal responsibility became a duty of the courts when the Legislature did not attempt to define "insanity" (see *People* v. *Drew, supra,* 22 Cal.3d 333, 340). While the judiciary has the responsibility for legal doctrine which it has created, "[t]he power of the court to reshape judicial doctrine does not authorize us to overturn constitutionally valid statutes" (*People* v. *Drew, supra,* 22 Cal.3d at p. 347). It is thus clear the judicial doctrine of diminished capacity is fully subject to legislative action so long as that action is constitutionally valid.

The exclusion of the capacity evidence represented by sections 22, 28 and 29 is not of constitutional dimension (*People* v. *Jackson* (1984) 152 Cal.App.3d 961, 968 [199 Cal.Rptr. 848], hg. den. May 31, 1984). It is "nothing more than a legislative determination that for reasons of reliability or public policy, 'capacity' evidence is inadmissible" (*ibid.*). The enactment neither prevented Lynn from disproving the mental state necessary to the charges nor deprived him of his constitutional right to require the People to prove every fact necessary to constitute the crime beyond a reasonable doubt (*ibid.*; cf. *In re Winship* (1970) 397 U.S. 358, 364 [25 L.Ed.2d 368, 374, 90 S.Ct. 1068, 1073]).

Moreover, as in *Jackson,* we do not believe the logic observed in *People* v. *Wetmore* (1978) 22 Cal.3d 318, 324 [149 Cal.Rptr. 265, 583 P.2d 1308], "any proof tending to show that a certain mental condition could not exist is relevant and should be admissible to show that it did not exist," compels a conclusion the statutes in question are invalid. The *Wetmore* statement was made *without* benefit of a statutory determination to the contrary which enunciates an equally reasonable point of view based on reliability or public policy grounds.

We observe it has recently been held there is no due process impediment in the substantive statutory definition of felony murder which omits malice as an element of that crime (*People* v. *Dillon, supra,* 34 Cal.3d 441, 472-476). The deletion of malice gives rise to no presumption which must pass due process muster (*id.,* at p. 476). It occurs to us that if the Legislature may constitutionally delete malice as an element of felony murder, it may

also constitutionally delete diminished capacity as a defense to crimes requiring particular mental states. In both cases, we are dealing with a matter of substantive statutory definition (see *id.*, at p. 475). In neither case is there a presumption involved that must withstand constitutional due process scrutiny because of its burden shifting effect.

We hold sections 22, 28 and 29 are valid enactments not depriving Lynn of any due process rights (see *Fisher* v. *United States* (1940) 328 U.S. 463, 476 [90 L.Ed. 1382, 1390, 66 S.Ct. 1318, 1325, 166 A.L.R. 176]; and see *Narten* v. *Eyman* (9th Cir. 1969) 460 F.2d 184, 190-191).

## IV

Lynn contends he should have been allowed to question the defense expert on whether he premeditated and deliberated before the killing. Section 29 precludes such testimony of an expert. Yet Lynn relies on California Constitution article I, section 28, subdivision (d), adopted by the electors as Proposition 8, effective June 9, 1982. The provision reads, in part: "Except as provided by statute hereafter enacted by a two-thirds vote of the membership in each house of the Legislature, relevant evidence shall not be excluded in any criminal proceeding . . . ."

Even assuming this provision countermands the prohibition of section 29 against expert testimony on the particular mental state, it is inapplicable to Lynn's case. *People* v. *Smith* (1983) 34 Cal.3d 251 [193 Cal.Rptr. 692, 667 P.2d 149], announced in all-encompassing language, "[w]e shall hold that Proposition 8 applies only to prosecutions for crimes committed on or after its effective date" (*id.*, at p. 258). *Smith* stated its reasons for this view, including such matters as the voters' intent in relation to Proposition 8's purpose of crime deterrence and difficult questions in terms of the ex post facto prohibition, then concluded in equally broad language, "we construe Proposition 8 to apply only to criminal proceedings arising out of offenses committed on or after the date it took effect" (*id.*, at p. 262).

There is no room for an exception to this holding, as Lynn urges. Proposition 8 in its totality is not applicable to Lynn's case. The trial court properly ruled under section 29 the defense expert could not testify on whether he premeditated and deliberated.

## V

Lynn argues the trial court erred in admitting Morgan's statements to Janice Campbell the day after the crime as spontaneous declarations (Evid.

Code, § 1240). Evidence Code section 1240 provides: "Evidence of a statement is not made inadmissible by the hearsay rule if the statement:

"(a) Purports to narrate, describe, or explain an act, condition, or event perceived by the declarant; and

"(b) Was made spontaneously while the declarant was under the stress of excitement caused by such perception."

The evening after the killing, Morgan came over to Campbell in a grocery parking lot. He appeared very upset and partially intoxicated. He told her Lynn had involved him in something very bad and she and Ingrid Gambrell should get Lynn out of the house. When Campbell asked Morgan if it was murder, he hung his head and cried, explaining he would not tell her because he did not want to involve her.

 The rule is: "The elements necessary to create the spontaneous declaration exception are: (1) there must be some occurrence startling enough to produce nervous excitement and render the utterance spontaneous and unreflecting; (2) the utterance must have been made before there has been time to contrive and misrepresent, i.e., while the nervous excitement still dominates and the reflective powers are in abeyance; and (3) the utterance must relate to the circumstances of the occurrence preceding it. [Citation.] 'Neither lapse of time between the event and the declarations nor the fact that the declarations were elicited by questioning deprives the statements of spontaneity if it nevertheless appears that they were made under the stress of excitement and while the reflective powers were still in abeyance.' [Citation.] In determining the existence of the essential elements of admissibility, some discretion is necessarily vested in the trial judge, particularly with respect to the requirement that the statement be made while declarant was still under emotional distress. [Citations.]" (*People* v. *Francis* (1982) 129 Cal.App.3d 241, 253-254 [180 Cal.Rptr. 873].)

Any error was clearly harmless in light of the massive evidence of Lynn's guilt, not the least of which was his own admissions. There was no reasonable probability of a different result (Cal. Const., art. VI, § 13; *People* v. *Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243]).

## VI

 Lynn contends admission of two notes Morgan received while in jail was erroneous not only because they were not adequately authenticated but also because their prejudicial effect outweighed their probative value.

As a result, he asserts, the giving of CALJIC No. 2.04 and 2.05, as well as a specially created instruction, also was error.

The notes were in the handwriting of neither Lynn nor Morgan. They were addressed to "Bob" and the person speaking in one of the notes indicates he was too drunk to drive at the time of the murder and had Morgan drive. It contains exculpatory statements in connection with the murder and says there was no intent to harm the victim. It advises Morgan, addressed as "Bob," his testimony can reduce the crime to second degree murder.

The second note says the person speaking did not want a "murder beef" and advised Morgan, again addressed as "Bob," to tell the jury the person speaking was drunk and went crazy. It admonishes "Bob" not to "burn" the speaker.

Morgan received the notes from jail trustees and turned them over to authorities. Lynn told Morgan he had "really fucked up, giving the notes over."

The trial court ruled the setting and circumstances surrounding the notes "say a great deal about the question of authenticity," noting the question ultimately would be left to the jury. Accordingly, it admitted the notes as authenticated and further found them relevant.

On the question of authentication, Evidence Code sections 1414 and 1421 provide: Section 1414. "A writing may be authenticated by evidence that:

"(a) The party against whom it is offered has at any time admitted its authenticity; or

"(b) The writing has been acted upon as authentic by the party against whom it is offered."

Section 1421. "A writing may be authenticated by evidence that the writing refers to or states matters that are unlikely to be known to anyone other than the person who is claimed by the proponent of the evidence to be the author of the writing."

Lynn's statement to Morgan after the notes were turned over to authorities fulfills the requirements of Evidence Code section 1414. Moreover, contents of the writings, such as the expressed desire to avoid a first degree murder conviction by Morgan's testimony and the veiled threats of harm if "Bob" testified adversely, make it unlikely anyone other than Lynn authored the notes. Thus, authentication as contemplated by Evidence Code section 1421

is present.[10] The trial court made a correct preliminary determination of authentication.

On the evidentiary value of the notes, it is clear they were relevant on the issues of Lynn's credibility and consciousness of guilt. They also tended to corroborate Morgan's testimony and to rebut Lynn's intoxication defense by showing his awareness of the events on the day of the crime. Probative value in the notes thus far outweighs their prejudicial effect (Evid. Code, § 352).

There was no error in admitting the notes nor in instructing the jury in connection with the notes.[11]

## VII

 Lynn contends the trial court abused its discretion in admitting over objection a tape recording of his interview with police. On cross-examination of Lynn, the prosecutor impeached Lynn's testimony by use of portions of a transcript of a tape recording made on the day of his arrest. The prosecutor then announced he intended to play the tape recording itself as part of his rebuttal. Lynn's counsel objected to the timing of playing the tape, saying it was improper rebuttal and stating at various points during argument on this objection, "[a]ll I'm saying is if he wants to impeach, not with the transcript, but with the tape, it ought to be done now [on cross-examination]," and: ". . . I would say that's proper impeachment. It should be done on cross-examination. They have got the tape. Let's have it done on cross-examination."

Lynn's counsel explained he wished to rehabilitate his client on redirect, not surrebuttal. The trial court ultimately ruled in Lynn's favor, the tape

---

[10]We note Evidence Code section 1421 uses the word "author" and not the word "writer." Accordingly, it is not necessary for purposes of authentication of a writing that the writing be physically created by the author's hand.

[11]The instructions given were: "If you find that a defendant attempted to persuade a witness to testify falsely at the trial, such attempt may be considered by you as a circumstance tending to show a consciousness of guilt. However, such attempt is not sufficient to prove guilt, and its weight and significance, if any, are matters for your determination.

"In determining whether the notes received by Robert Morgan, exhibits 32 and 33, were generated by or on behalf of the defendant, the jury may consider whether the notes have been acted upon as authentic by the defendant or whether the notes refer to or state matters that are unlikely to be known to anyone other than the person who has claimed to be the author of or responsible for the notes.

"If you find that a defendant attempted to suppress evidence against him in any manner, such as by the intimidation of a witness, such attempts may be considered by you as a circumstance tending to show a consciousness of guilt. However, such evidence is not sufficient in itself to prove guilt, and its weight and significance, if any, are matters for your consideration."

was played and Lynn was further examined about it on redirect and recross-examination.

There was no objection to the contents of the tape as a whole or to playing the tape at some point during the trial. Accordingly, the question now raised was not preserved for appeal (Evid. Code, § 353, subd. (a); *People* v. *McDowell* (1972) 27 Cal.App.3d 864, 879 [104 Cal.Rptr. 181]).

### VIII

Lynn asserts the jury was improperly instructed regarding admissions.

### A

First, he challenges a modification made to the third paragraph of CALJIC No. 2.71 which in the first two paragraphs defines admissions and informs the jury of its role in the matter. The modified paragraph read: "Evidence of an oral admission of the defendant should be viewed with caution except as to those statements which were tape recorded. Evidence of the circumstances under which an admission was made is admissible as relevant to its weight and credibility."

The exception clause was added at the request of the prosecutor and the second sentence was added at the request of Lynn.

It is the rule the cautionary instruction is not required where the statements are tape recorded (*People* v. *Hines* (1964) 61 Cal.2d 164, 173 [37 Cal.Rptr. 622, 390 P.2d 398] (overruled on another point in *People* v. *Murtishaw* (1981) 29 Cal.3d 733, 774-775, fn. 40 [175 Cal.Rptr. 738, 631 P.2d 446]); *People* v. *Ramirez* (1974) 40 Cal.App.3d 347, 352 [114 Cal.Rptr. 916]). The modification thus was proper.

Lynn's argument the modification suggested that any tape-recorded statement is an admission simply ignores the plain meaning of the language used. The language merely carved out an exception to the cautionary instruction applicable to tape-recorded statements. The instructions otherwise left it to the jury to determine whether an admission was made and what it could make of any admission it found. Moreover, contrary to Lynn's argument, there was in the modification no encouragement of the jury to fail to scrutinize the conversation.

### B

Lynn asserts CALJIC No. 2.71.5, concerning adoptive admissions, should have been given as well, since in the tape-recorded conversation he

admitted contact with Williams on the day of the killing but denied participation, and he made many false or evasive statements to police. CALJIC No. 2.71.5 reads: "If you should find from the evidence that there was an occasion when the defendant, under conditions which reasonably afforded him an opportunity to reply, failed to make denial [or made false, evasive or contradictory statements,] in the face of an accusation, expressed directly to him or in his presence, charging him with the crime for which he now is on trial or tending to connect him with its commission, and if you should find that he heard the accusation and understood its nature; the circumstance of his silence [and conduct] on that occasion may be considered against him as indicating an admission that the accusation thus made was true. Evidence of such an accusatory statement is not received for the purpose of proving its truth, but only as it supplies meaning to the silence [and conduct] of the accused in the face of it; and unless you should find that his conduct at the time indicated an admission that the accusatory statement was true, you should entirely disregard the statement."

The major thrust of this instruction is against a defendant's interest. Only the last sentence could be of aid to a defendant's case. Accordingly, even if we were to assume error in failing to give the instruction, it is harmless beyond any reasonable doubt (*People* v. *Watson, supra,* 46 Cal.2d 818, 836).

Moreover, Lynn points to no specific evidence which might have been found to be an adoptive admission, and thus would have supported giving the instruction. Accordingly, he does not demonstrate any error on appeal (*People* v. *Green* (1979) 95 Cal.App.3d 991, 1001 [157 Cal.Rptr. 520]).

IX

■ Lynn contends it was error to give CALJIC No. 2.62 relating to a defendant's failure to explain or deny evidence against him. He claims there was no area of the defense case that was not either explained or denied, given the diminished capacity defense.

There were several pieces of evidence against Lynn which he did not explain or deny, including his conscious state on the day of the crime when he had consumed the amount of alcohol he claimed, his hatred for Williams in light of Williams' nonthreatening conduct and how his father's suicide 25 years before the killing related to it when Lynn did not think about his father at the time of the killing. Thus, there was an evidentiary basis for CALJIC No. 2.62 and no error in giving the instruction.

## X

 Lynn asserts there was error in excusing a juror for cause after it was reported the prospective juror was overheard saying she believed the prosecutor was brainwashing the jurors during voir dire and making statements to make them think the way the prosecutor felt. The juror admitted making the statements but said she could be fair to both sides.

The two statements of the juror raised a conflict in the evidence on the question of bias. The trial court resolved this conflict against the juror. It was the trial court's function to make this determination, and we are bound by it (*People* v. *Torres* (1982) 133 Cal.App.3d 265, 278-279 [184 Cal.Rptr. 39]). There was no abuse of discretion in excusing the juror for cause.

## XI

 Finally, Lynn contends the trial court erred in admitting four photographs of Williams taken at the crime scene because the photographs were cumulative and highly prejudicial. Two showed the tightly tied cord around Williams' neck, one featured the knot in the cord and one showed Williams' face with tongue protruding.

Lynn acknowledges this decision is primarily left to the trial court's discretion and that photographs disclosing the manner in which a victim is wounded are relevant to the issue of malice (see *People* v. *Murphy* (1972) 8 Cal.3d 349, 363, 365 [105 Cal.Rptr. 138, 503 P.2d 594]). In Lynn's case, the photographs were also probative of the mental state issues connected with torture murder. Further, they were relevant to the medical testimony about Williams' injuries and circumstances of death. There was no error in admitting the photographs (see *People* v. *Cruz* (1980) 26 Cal.3d 233, 253 [162 Cal.Rptr. 1, 605 P.2d 830]; *People* v. *McElheny* (1982) 137 Cal.App.3d 396, 407 [187 Cal.Rptr. 39]; *People* v. *Long* (1974) 38 Cal.App.3d 680, 689 [113 Cal.Rptr. 530]).

Judgment affirmed.

Brown (Gerald), P. J., and Staniforth, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied October 24, 1984.