Filed 7/15/14  P. v. Leiva CA2/2

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>GEORGE M. LEIVA,<br><br>Defendant and Appellant. | B245931<br><br>(Los Angeles County<br>Super. Ct. No. BA381624) |

APPEAL from a judgment of the Superior Court of Los Angeles County. Bob S. Bowers, Jr., Judge.  Affirmed.

Rodger Paul Curnow, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, James William Bilderback II and William H. Shin, Deputy Attorneys General, for Plaintiff and Respondent.

_____

In a criminal information, George M. Leiva (Leiva) was charged with the murder of Mauricio Jimenez (Jimenez) (Pen. Code § 187, subd. (a)).[1] It was specially alleged, inter alia, that Leiva personally and intentionally discharged a firearm causing great bodily injury and death (§ 12022.53, subd. (d)), and that the murder was committed for the benefit of, at the direction of, and in association with, a criminal street gang (§ 186.22, subd. (b)(1)(C)). The jury convicted Leiva of first degree murder and found all special allegations to be true. The trial court imposed an aggregate indeterminate sentence of 50 years to life in state prison.

Leiva appeals his conviction and argues: (1) he was denied due process and a fair trial when the trial court admitted a jailhouse "kite"[2] into evidence without proper authentication, and when it allowed a deputy sheriff to testify regarding the contents and meaning of the kite even though her transcription of the kite violated the secondary evidence rule; (2) the trial court abused its discretion when it refused to declare a mistrial after jurors were intimidated by court spectators; (3) he was denied effective assistance of counsel because defense counsel failed to call an expert witness on eyewitness identification; and (4) if the secondary evidence rule objection was forfeited below, he was denied effective assistance of counsel because of that forfeiture. We find no error and affirm.

## FACTS

**Prosecution Case**

*The shooting*

On Friday, August 14, 2009, Jimenez had been dating his girlfriend, Monica Arriaga (Arriaga), for two months. They were members of a gang called Playboys. On the street, Jimenez went by the name Minor. That evening, they went to a party in

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

[2] The kite was a jailhouse note found on Oscar Dominguez (Dominguez) while he was in jail awaiting trial as Leiva's codefendant. The case against him resulted in a mistrial. Subsequently, he was retried and convicted of being an accessory after the fact to Jimenez's murder.

2

Compton, where Jimenez drank liquor and beer. At about 3:00 a.m., a friend dropped them off at 51st Street and Towne near South Park. That area is considered Playboys territory.

After sitting at South Park for about 30 minutes, Jimenez and Arriaga left and started walking home. They took an alley and headed toward 52nd Street. At the end of the alley, they encountered two men. The man on the left, later identified as Leiva, demanded to know what gang Arriaga and Jimenez belonged to by asking, "Where you from?" Jimenez said he was from "Playboys." With laughter and a smile on his face, Leiva said, "Today is your lucky day." Jimenez gave Arriaga a push and told her to go. As Arriaga was running away, she heard gunshots. When the gunfire ceased, she returned to Jimenez, who had been shot and was lying face down. Leiva said, "Don't think you are lucky, bitch, because you are next." He and the second man fled the scene.

Arriaga called 911. Police officers arrived about seven minutes later, and an ambulance came a few minutes after that.

*The initial investigation*

When detectives arrived at the crime scene, they saw approximately 14 expended nine-millimeter cartridge cases. All of the cartridge cases were manufactured by Winchester.

On the day of the shooting, Arriaga was interviewed by detectives. She described the shooter as a Hispanic man with short spikey hair who was five feet eight or nine inches tall, average in size, dark-skinned, and wearing a black T-shirt with designs on the right side. She described the second person as a Hispanic man who was about the same height as the shooter but older and "chunkier." In addition, she indicated that the second man was light-skinned, had slicked-back hair and wore a white T-shirt.

*The autopsy*

Based on an autopsy, a deputy medical examiner concluded that Jimenez died of multiple gunshot wounds. He had been shot at least 13 times.

*Identification*

About five weeks after the shooting, Arriaga met with a detective and circled Leiva's picture in a six-pack photographic lineup. She wrote that he was "the one that pulled out [the] gun and shot [Jimenez]." At the preliminary hearing and trial, she again identified Leiva.

*Leiva's interview*

Leiva was arrested on October 21, 2009.

Detectives interviewed Leiva at the police station. He said he was as a member of the Hangout Boys, or "H.O.B.," a street gang. Its territory was west of Main Street between 41st and 43rd. According to Leiva, he heard from a police officer that Minor, a Playboys gang member, was killed. Someone else said that Minor had been walking with a girl and had been killed, too. Leiva said he was home all day on August 14, 2009, with his wife, kids and mother. That night, he played a video game called Call of Duty online under the screen name Gordo.

At one point, the detectives showed Leiva his picture. It was circled. He asked, "So why'd she circle me?" When he was asked what he meant, he responded, "She circled the picture, right?"

*Evidence establishing a connection between Leiva and Dominguez*

A gang expert testified as follows. The Hang Out Boys and 55 Bunch are criminal street gangs that get along with each other but are rivals of the Playboys. At the time of the shooting, Leiva was a member of the Hang Out Boys. Previously, a police officer had stopped a vehicle driven by Leiva. Dominguez was in the front passenger seat. He had "55 Bunch" tattooed on his chest and "5B5" on the back of his neck.

*The jail call*

From jail, Leiva called his wife. The call was recorded. He stated, inter alia, "I got no defense whatsoever," and "You didn't get me here, I got myself here."

*The kite*

During the trial, the prosecutor filed a motion to admit evidence of a handwritten note known as a kite. The motion recounted the following facts: "On or about August

4

3rd or 8th, 2012, [the trial court] asked [Dominguez] in open court if he wished to testify on behalf of [Leiva] at the upcoming trial. [The trial court] did so upon the request of [Leiva's] counsel. . . . Counsel for Dominguez . . . stated on the record that she did not want her client to testify at trial, and this essentially ended the on the record colloquy." (Fn. omitted.) A few days later, on August 10, 2012, Dominguez's counsel asked for an order requiring the sheriff's department to classify Leiva and Dominguez as keep-always, meaning they would be separated while awaiting court proceedings. The trial court granted the request. On August 15, 2012, sheriff's personnel searched Dominguez in preparation for his transport to court and discovered the kite.

Leiva objected that the kite lacked authentication. The trial court overruled the objection based on Evidence Code section 1421.

A custody assistant with the Los Angeles County Sheriff's Department was called to the stand. She testified that she searched Dominguez before he was taken from jail to court and found a kite, a small piece of paper or note passed around between inmates. A deputy sheriff testified that she typed up the contents of the kite. In doing so, she translated the meaning of initials and abbreviations, and she translated Spanish terms into English.

The kite was addressed to "C" for "Criminal," which was Dominguez's nickname. It was from D for "Duende," meaning Elf in Spanish, which was Leiva's nickname. The deputy sheriff who typed up the kite read it to the jury, stating, "It starts off by saying: [¶] 'First of all, greetings my ninja. Strict to it. As you already know we are keep aways 'cause the judge thinks we [are] trying to come up with a master plan, which he is wrong, right? Well, check it out. This either makes me or breaks me. I highly understand that. But it all depends on you, my boy. You're a smart kid and I know you can pull it off. Choose your words wisely. [¶] Now you already told me you were up to it. Don't let me find out you refused because you are going to make things worse for the both of us. You feel me? Don't go up there and make us look like jerks either. It's all on those 12 people, my boy, so spit your game to them. [¶] These are the three main topics: No. 1, get me out [of] the party because I was never there. No. 2, you informed me about what

5

happened and with what kind of caliber.' [¶] And in parenthesis is a '9' for .9 millimeter. [¶] 'No. 3, and the reason you put me at the party, we were bumping heads or whatever, and also 'cause you wanted to stay free, which you were. Make sure you let those 12 people know that you have no problem cooperating, but you can't cooperate on something it ain't true. You feel me? None of these three topics are going to affect you, my boy. [¶] Topic two is really important, my boy. One day you told me the war story, blah, blah, blah. Well, that's about it. I love you, fool. And you know that 'cause if I didn't you wouldn't be here. I wish you the best. Start thinking on how you are going to spit your game with the three topics. It's time to shine, my boy. Flush this A.S.A.P. and call my heffa or your homie S for a T.D.' [¶] In parenthesis 'touchdown.' [¶] 'Oh, I am still waiting on that address. Once I get it I will call S. Enjoy the rest of your day. Don't trip. I will make sure my L'— [¶] in parenthesis 'lawyer— [¶] '—'asks you some questions so the three topics can come out to light because the other fool is not, 'cause he knows that will benefit me. Take care, fool.[]' [¶] And then it has the letters 'C,' 'T' and 'R,' which in jail—it's in parenthesis—it's 'Con todo respecto.'" After the "D" for Duende, there was three dots and two slashes, which is the symbol for 13 in Mayan. And then the kite stated: "'Stick to the same, you did not know what the other two were going to do.'"

The original kite and a photocopy were admitted into evidence. The deputy sheriff's typed transcription was not.

**Defense Case**

Elizabeth Barajas (Barajas) testified as follows: At 4:08 a.m. on the night of the shooting, Arriaga called Barajas and said Jimenez had been shot four times by "two Black guys" from Avalon, and that they left the scene in a black car. Between 10:00 a.m. to 11:00 a.m., Barajas went to the scene of the crime and saw Arriaga. She said that "it was two Hispanic males; they were in a black car; they were pretty boys—meaning . . . they are nice dressed—they were not gang related. [¶] She said that from the car, one of the males tells him, 'Where are you from?' [¶] [Jimenez] answers, 'They call me Big Minero from Playboys.' [¶] And [one] of the guy[s] tells him, 'Well, today is your

6

lucky day,' and he shoots him." Later, sometime near 12:00 p.m. to 1:00 p.m., Arriaga and Barajas were still at the crime scene. Jimenez's friends were arriving at the crime scene to place candles and flowers. Arriaga said "when they were walking from 51st to 52nd down the alley, [Jimenez and she saw] two [Hispanic] males standing right on the corner. [¶] By the time [Jimenez and she] were approaching [the two Hispanic males], one of the guys asked . . . , 'Where are you from?' [¶] [Jimenez] said, 'They call me big Minero from Playboys.' [¶] At that time the guy said . . . , 'Today is your luck day, peanut,' [and] stared shooting [Jimenez]. [¶] At the time [Jimenez] [spat] in his face, and he was telling [Arriaga] to run. So she said she ran towards 52nd and Avalon, and she was ducking within the cars because the other guy was trying to shoot at her. And then the guys ran towards Avalon, got in a black car and left." Arriaga described the two Hispanic males as "cholos," and said that they had black hoodies. She was not able to see their faces.

**Rebuttal**

Arriaga testified that she called Barajas to say that Jimenez had been shot, and they were at 52nd and Avalon. Though Arriaga spoke to Barajas later, it was not at the scene of the crime. Also, Arriaga, never said the people involved were "Black," nor did she say they were Avalon gang members.

A police officer interviewed Arriaga shortly after the shooting at about 4:00 a.m. She described the suspects as two Hispanic men, black hair, brown eyes, approximately five feet eight inches tall, 160 pounds, and 21 to 22 years of age. She said one suspect was wearing a black shirt with blue jeans, and the other was wearing a white shirt with blue jeans. The officer broadcasted the suspects' descriptions at about 4:09 a.m.

**Events Leading to the Motion for a Mistrial; the Motion; Conviction**

After closing arguments, the jury began deliberation.

The jury sent a note to the trial court stating, inter alia: "Yesterday (Thursday) during the afternoon break around 3, the girl and older boy that were sitting in the back of the court all week may have been taking cell phone pictures and/or video of the jury in the hallway. Cell phones were being held like a camera while they sat by the door when

7

we were going back in.  3 jurors saw this.  Could have been watching video but could have been video/pics of us."

The trial court held a hearing.  Defense counsel indicated his belief that the People referred to in the jury's note were members of Leiva's family.  According to the trial court, it planned to have investigators confiscate anything that could be used to take photographs.  At that point, defense counsel stated:  ". . . I don't see how any juror, no matter what they say could possibly be fair and impartial under the circumstances."

Subsequently, the trial court informed the jury that it was implementing a plan to allay any concerns that it might have.  The trial court identified the three jurors, and also one alternate, who saw the suspicious activity.  They were Juror Nos. 2, 5, 10 and 51.  The trial court questioned every juror.  Juror No. 1 was asked if she could still be fair and impartial.  She said yes.  After being asked, the rest of the jurors said they could be fair and impartial, and that they did not feel personally threatened by the spectators.[3]

Defense counsel moved for a mistrial.  He stated that it was "based upon the fact that this incident . . . is of such major import that the jury cannot be fair and impartial at this point.  [¶]  And I know the jurors have been examined individually by the court.  They must be made of sterner stuff than myself or anybody I know, because to me . . . [the photographing or filming] means . . . that the gang or the family or somebody was intending to take some kind of reprisal action against individuals members of the jury.  [¶]  Now, since the beginning of this trial . . . , we have heard nothing . . . other than the violence, the vindictiveness . . . of gangs and people who are in them.  [¶]  Here there could be no other reason for a person to film a jury member but to mark their identity for posterity and possible reprisal.  [¶]  For them to say that it does not affect them means either they are in real fear and are not telling the truth, or that they believe that this was an attempt to scare them and now they are angry and they are going to get revenge by convicting him, or some false pride that they can't be that easily persuaded.  [¶] . . . Everything about this indicates that this is a serious matter and it's serious because

---

**3**     After Juror No. 1 was questioned, defense counsel asked the trial court to inquire as to whether the other jurors felt personally threatened.

8

there is a threat to a juror, or a number of jurors, whether they recognize it as such or not. [¶] And I just can't believe that those people can sit there . . . [and] possibly ignore [what happened] and continue to deliberate in a fair and impartial manner[.]"

After the prosecutor argued, the trial court stated: "[Defense counsel], the court believes that what you say would have a great[] impact but it assumes something to be true. And that is that [in] fact photographs were being taken and or video [was] being taken. Now, . . . in this particular case even the query, the way it's worded, the juror indicates that they could be wrong. I mean, they indicate they could be playing video games and that is a reason why the court is taking this method of approach in addressing this entire issue. [¶] . . . There was nothing about anything [the jurors] said or by their body language would indicate that they were hiding something or were in fear. I believe their answers to have been genuine and to the point. [¶] . . . [¶] And in this particular case, . . . I want to point out [that] the court firmly believes that no such [mis]conduct took place [and] that the jury can be fair and impartial . . . at this point[.] [W]hat I don't want to do is set a precedent [establishing] . . . you can have gang cases and all you have to do is go in the hallway, look like you are [taking photographs] and it will cause a mistrial, and so therefore the motion is denied."

Leiva was convicted and sentenced.

This timely appeal followed.

## DISCUSSION

### I. The Kite Evidence.

According to Leiva, the trial court should have excluded the kite based on lack of authentication, and it should have precluded the deputy sheriff from testifying regarding the contents and meaning of the kite because her transcription violated the secondary evidence rule. He contends that the trial court's errors resulted in a denial of due process and a fair trial.

We disagree.

9

A.  Standard of review; constitutional principles.

Under state law, rulings on the admissibility of evidence are reviewed for abuse of discretion.  (*People v. Scott* (2011) 52 Cal.4th 452, 491.)  "If a judgment rests on admissible evidence[,] it will not be reversed because the trial court admitted that evidence upon a different theory, a mistaken theory, or one not raised below. [Citations.]" (*People v. Brown* (2004) 33 Cal.4th 892, 901.)  When the erroneous admission of evidence resulted in an unfair trial, there is a violation of due process. (*People v. Albarran* (2007) 149 Cal.App.4th 214, 229 (*Albarran*).)  "Absent fundamental unfairness, state law error in admitting evidence is subject to the traditional *Watson* test: The reviewing court must ask whether it is reasonably probable the verdict would have been more favorable to the defendant absent the error.  [Citations.]" (*People v. Partida* (2005) 37 Cal.4th 428, 439.)  In contrast, when a violation of due process is shown, the reviewing court must reverse "unless the state can prove beyond a reasonable doubt that the error did not contribute to the verdict.  [Citation.]" (*Albarran*, *supra*, 149 Cal.App.4th at p. 229.)

In *Perry v. New Hampshire* (2012) 132 S.Ct. 716, 723, the court explained that "[o]nly when evidence 'is so extremely unfair that its admission violates fundamental conceptions of justice,' [citation], [has the court] imposed a constraint tied to the Due Process Clause." (*Ibid*.)  Boiling this concept down to a workable rule, the Ninth Circuit stated:  "Evidence introduced by the prosecution will often raise more than one inference, some permissible, some not; we must rely on the jury to sort them out in light of the court's instructions.  Only if there are no permissible inferences the jury may draw from the evidence can its admission violate due process.  Even then, the evidence must 'be of such quality as necessarily prevents a fair trial.'  [Citation.]  Only under such circumstances can it be inferred that the jury must have used the evidence for an improper purpose." (*Jammal v. Van de Kamp* (9th Cir. 1991) 926 F.2d 918, 920, fn. omitted (*Jammal*).)  California courts have utilized the *Jammal* court's view of how to identify when a trial is unfair.  (*People v. Hunt* (2011) 196 Cal.App.4th 811, 817; *Albarran*, *supra*, 149 Cal.App.4th at p. 229.)

10

B.  <u>Authentication</u>.

"Authentication of a writing means (a) the introduction of evidence sufficient to sustain a finding that it is the writing that the proponent of the evidence claims it is or (b) the establishment of such facts by any other means provided by law."  (Evid. Code, § 1400.)  A writing must be authenticated before it may be received into evidence.  (Evid. Code, § 1401, subd. (a).)  Statute provides, inter alia, that a "writing may be authenticated by evidence that the writing refers to or states matters that are unlikely to be known to anyone other than the person who is claimed by the proponent of the evidence to be the author of the writing."  (Evid. Code, § 1421.)  Case law notes that "[c]ircumstantial evidence, content and location are all valid means of authentication [citations]."  (*People v. Gibson* (2001) 90 Cal.App.4th 371, 383.)

According to Leiva, the kite was inadmissible because it stated facts which could have been known to others, including law enforcement officers and other inmates.  This argument, however, is not supported by the cases relied upon by Leiva.  We examine those cases below.

In *People v. Lynn* (1984) 159 Cal.App.3d 715 (*Lynn*), two people—Lynn and Morgan—were in jail together in connection with the murder of a man during a drug deal gone bad.  Jail trustees handed Morgan two notes, neither of which were in Lynn's handwriting.  They were addressed to "Bob."  (*Id*. at pp. 721–723, 735.)  The "person speaking in [the first note] indicate[d] he was too drunk to drive at the time of the murder and had Morgan drive.  It contains exculpatory statements in connection with the murder and says there was no intent to harm the victim.  It advises Morgan, addressed as 'Bob,' his testimony can reduce the crime to second degree murder.  [¶]  The second note says the person speaking did not want a 'murder beef' and advised Morgan, again addressed as 'Bob,' to tell the jury the person speaking was drunk and went crazy.  It admonishes 'Bob' not to 'burn' the speaker."  (*Id*. at p. 735.)  The trial court ruled that the notes had been authenticated by the setting and circumstances.  (*Ibid*.)  The Court of Appeal stated, in part, that the "contents of the writings, such as the expressed desire to avoid a first degree murder conviction by Morgan's testimony and the veiled threats of harm if 'Bob'

11

testified adversely, make it unlikely anyone other than Lynn authored the notes. Thus, authentication as contemplated by Evidence Code section 1421 is present. The trial court made a correct preliminary determination of authentication." (*Lynn*, *supra*, 159 Cal.App.3d at pp. 735–736, fn. omitted.)

In *People v. Fonville* (1973) 35 Cal.App.3d 693 (*Fonville*), disapproved on other grounds in *Donaldson v. Superior Court* (1983) 35 Cal.3d 24, 32, the trial court ruled that a recorded statement was admissible. The reviewing court affirmed based on Evidence Code section 1421, noting: "[I]t would appear that the statements regarding what had been denied to the police, what had been told to the police regarding the declarant's state of intoxication, quantity of intoxicants taken, and when the decedent had left the cafe, indicate that it was in fact appellant whose words were on the recording. They are matters that are unlikely to have been known by anyone other than the appellant." (*Fonville*, *supra*, 35 Cal.App.3d at p. 709.)

A recorded jailhouse conversation was at issue in *People v. Estrada* (1979) 93 Cal.App.3d 76. The court concluded that the recording was authenticated under Evidence Code section 1413 because the investigator who made it identified the tape he used for the recording.[4]

In our view, *Lynn* and *Fonville* support the trial court's ruling based on circumstantial evidence, content and location, or, alternatively, based on Evidence Code section 1421.

Similar to *Lynn*, the setting and circumstances authenticate the kite as being authored by Leiva. Here, the kite was addressed to a person with Dominguez's nickname from a person with Leiva's nickname, and it contained inside information regarding facts of the case against Leiva, such as his presence at a party and private conversations between Dominguez and Leiva. Also, it implies a familiarity with the prosecution's case against Leiva and strategies that might assist the defense. For example, the kite implies that the author had informed the police that the case involved a weapon of a particular

---

[4]     Evidence Code section 1413 provides: "A writing may be authenticated by anyone who saw the writing made or executed, including a subscribing witness."

caliber and he therefore needed an innocent explanation for his knowledge. In addition, the kite was found on Dominguez's person, suggesting he purposefully retained possession of it believing it to be authentic because it correctly represented the facts and conversations as he recalled them.

The instruction for Dominguez to spit his game to the jury was clearly a message for him to tell a story that would exonerate the author, and it is unlikely that anyone other than Leiva had a motive to author the kite. As in *Lynn*, the kite contained veiled threats if the recipient did not capitulate. It stated that the author loved the recipient, otherwise he "wouldn't be here," which implied that the author could have the recipient killed. Also, the kite informed the recipient, "Don't let me find out you refused" to abide by the instructions in the kite. The veiled threats were unlikely to come from anyone other than Leiva. And other than Dominguez, only Leiva knew what they had previously discussed.

For all the same reasons, we conclude that Evidence Code section 1421 applies. In arguing that Evidence Code section 1421 does not apply, Leiva contends that the kite contained facts that could have been known to law enforcement officers or other inmates. However, *Fonville* establishes that when analyzing whether others were likely to know information contained in a writing, courts do not take the knowledge of law enforcement officers into account. Though *Fonville* did not say this expressly, it is the inescapable conclusion. After all, the *Fonville* court concluded that it was unlikely that anyone other than the appellant knew what he had told police officers. But, of course, the police knew. Thus, the analysis necessarily excluded them. Regarding other inmates, there is no evidence of how they would have learned the contents of the kite. Because the kite is incriminating, it is highly unlikely that Leiva broadcast the information in the kite to inmates throughout the jail where he was housed. And because that is true, it is highly unlikely other inmates were privy to the information.

C. Secondary evidence rule.

As conceded by Leiva, his trial counsel did not object to the reading of the transcribed kite based on the secondary evidence rule. The issue has not been preserved

13

for appeal.  (Evid. Code, § 353; *People v. Harrison* (2005) 35 Cal.4th 208, 230; *People v. Holford* (2012) 203 Cal.App.4th 155, 169.)

Even if the issue had been preserved, we would find no error.

The secondary evidence rule provides in relevant part:  "(a) The content of a writing may be proved by otherwise admissible secondary evidence.  The court shall exclude secondary evidence of the content of writing if the court determines either of the following:  [¶]  (1) A genuine dispute exists concerning material terms of the writing and justice requires the exclusion.  [¶]  (2) Admission of the secondary evidence would be unfair."  (Evid. Code, § 1521.)

The original kite was received into evidence.  And so, too, was a photocopy of the kite.  A deputy sheriff typed up a transcription that interpreted certain initials, abbreviations and symbols in the kite.  She explained to the jury that her interpretations were in parentheses.  Then she read her transcription to the jury, making sure to identify what constituted interpretation.  Properly understood, the People offered the original kite and a photocopy of the kite to prove the contents of the writing, and then offered the deputy sheriff's testimony to prove the meaning.

Leiva argues:  "In the instant case, the court should have excluded [the deputy sheriff's transcription containing her interpretations of certain portions of the kite] as being required in the interests of justice since this transcription contained more than the contents of the original kite; it contained [the deputy sheriff's] interpretations of a document which was made from the kite and set in parentheses.  For example, in the place where the writer of the kite says, 'You informed me about what happened and with what kind of caliber,' [the deputy sheriff added a '(9),' indicating that the homicide weapon was a 9 caliber weapon, namely a 9 mm semi-automatic.  [Citation.]  Other examples include interpretations of 'C' meaning Dominguez's moniker 'Criminal' and ['D'] indicating a moniker sometimes attributed to [Leiva] of ['Duende,' meaning 'Elf'];  and three dotes and two slashes indicating the Mayan number of 13 used by Latino gangs in Southern California."  (Fn. omitted.)

14

This argument misses the mark. The People did not offer the deputy sheriff's interpretation of initials, abbreviations and symbols as evidence of the content of the kite. As we have indicated, her interpretations were offered as evidence of the meaning of those initials, abbreviations and symbols. Leiva contends that the deputy sheriff added "(9)" to the content of the kite. But this contention is belied by the record. The original kite stated: "You informed me about what happened and with what kind of caliber (9)[.]" All the deputy sheriff did was offer her interpretation that "(9)" referred to ".9 millimeter."

## II. Denial of Mistrial.

Leiva argues that he should have been granted a mistrial because the jurors were intimidated by court spectators and he was denied his constitutional right to trial by an impartial jury. This argument lacks merit.

A. <u>Standard of review; mistrial principles; constitutional principles</u>.

We review the denial of a motion for mistrial under the abuse of discretion standard. (*People v. Montes* (2014) 58 Cal.4th 809, 884.) "A trial court should grant a motion for mistrial 'only when "'a party's chances of receiving a fair trial have been irreparably damaged'"' [citation], that is, if it is, 'apprised of prejudice that it judges incurable by admonition or instruction.'" (*People v. Avila* (2006) 38 Cal.4th 491, 573.)

"An accused has a constitutional right to a trial by an impartial jury. [Citations.] An impartial jury is one in which no member has been improperly influenced [citations] and every member is '"capable and willing to decide the case solely on the evidence before it"' [citations]." (*In re Hamilton* (1999) 20 Cal.4th 273, 293–294 (*Hamilton*).) "Misconduct on the part of a spectator is a ground for mistrial if the misconduct is of such a character as to prejudice the defendant or influence the verdict." (*People v. Lucero* (1988) 44 Cal.3d 1006, 1022.)

"'A sitting juror's involuntary exposure to events outside the trial evidence, even if not 'misconduct' in the pejorative sense, may require . . . examination for probable prejudice. Such situations may include attempts by nonjurors to tamper with the jury, as by bribery or intimidation. [Citations.]' [Citation.] '[T]ampering contact or

communication with a sitting juror[] usually raises a rebuttable "presumption" of prejudice. [Citations.]' [Citation.] 'Still, whether an individual verdict must be overturned for jury misconduct or irregularity """"is resolved by reference to the substantial likelihood test, an objective standard.""" [Citation.] Any presumption of prejudice is rebutted, and the verdict will not be disturbed, if the entire record in the particular case, including the nature of the misconduct or other event, and the surrounding circumstances, indicates there is no reasonable probability of prejudice, i.e., no *substantial likelihood* that one or more jurors were actually biased against the defendant. [Citations.]' [Citation.]" (*People v. Harris* (2008) 43 Cal.4th 1269, 1303.) We must independently determine whether there was a reasonable probability of prejudice. (*Id*. at p. 1304.)

   B. No abuse of discretion.

   The question is whether there was a substantial likelihood that one or more jurors were biased against Leiva. In our view, the answer is no. The jurors stated that they did not feel threatened, and that they could be fair and impartial. The trial court opined that nothing in the jurors' body language or words suggested that they were hiding something or afraid. Moreover, the conduct of the spectators was ambiguous to the jurors and could well have been innocent. As a consequence, we conclude that the trial court did not abuse its discretion.

   At most it can be said that the spectators engaged in conduct that, when seen by the three jurors and one alternate, was cause for some level of concern. This conduct, and the jurors' reactions to it, fall below the threshold of what amounts to the denial of an impartial jury. We take our cue from *People v. Panah* (2005) 35 Cal.4th 395, 480 (*Panah*) and *Hamilton*.

   In *Panah*, the record indicated "that some supporters of defendant were following or 'shadowing' the jurors during breaks in their deliberations, while others, including his mother, were clustering near the jury while it was assembling on breaks. Against this backdrop, the trial court reported a juror had told the bailiff she felt intimidated by the presence of defendant's supporters, particularly his mother." (*Panah*, *supra*, 35 Cal.4th

16

at p. 480.)  The court concluded that "there is nothing on the record to support defendant's claim that he was denied an impartial jury." (*Ibid.*)

The relevant facts in *Hamilton* were these.  According to a juror, the defendant's sister and her boyfriend parked in an alley behind the juror's house.  They sped away when the juror saw them.  Then, according to the juror, she telephoned a friend who was a police dispatcher and asked for increased patrols near her residence.  As a precursor to its analysis, the court stated:  "[W]e question whether a convicted person can ever overturn the verdict on grounds that persons *acting in his behalf* deliberately sought to influence the jury.  Certainly no such claim could ever be valid where the *accused himself* had instigated the incident; a party cannot profit by his or her own wrongdoing.  But even where, as here, there is no evidence petitioner was directly involved, recognition of such a claim suggests tempting opportunities for [the allies of defendants in criminal trials] to manufacture challenges against subsequent convictions." (*Hamilton*, *supra*, 20 Cal.4th at p. 305.)  Next, the court stated:  "'[W]hen the alleged misconduct involves an unauthorized communication with or by a juror, the presumption [of prejudice] does not arise unless there is a showing that the content of the communication was about the matter pending before the jury, i.e., the guilt or innocence of the defendant.  [Citations.]' [Citations.]  As described [by the juror], the alley incident included no 'communication' about the trial, only a brief, nonverbal observation of persons parked outside her home. [¶]  Finally, if the incident, real or imagined, might be interpreted as an improper attempt to intimidate [the juror] by silent menace, the result is no different.  The objective circumstances give rise to no substantial likelihood that the encounter resulted in [the juror's] actual bias against [the defendant]." (*Id*. at pp. 305–306.)

The ambiguous conduct of the spectators in the case at bar does not rise to the level of shadowing jurors during deliberation or parking behind the house of a juror.  Thus, if there was no prejudice in *Panah* or *Hamilton*, we are compelled to conclude that there was no prejudice here.

17

## III. Ineffective Assistance of Counsel.

Absent trial court error, Leiva nonetheless contends that he is entitled to a reversal based on ineffective assistance of counsel. Specifically, he contends he was prejudiced because defense counsel unreasonably failed to: (1) call an expert on eyewitness identification; and (2) object based on the secondary evidence rule to the deputy sheriff's reading of her transcription of the kite.

We cannot concur.

A. The law regarding ineffective assistance of counsel.

"A claim of ineffective assistance of counsel in violation of the Sixth Amendment entails deficient performance under an objective standard of professional reasonableness and prejudice under a test of reasonable probability of an adverse effect on the outcome. [Citation.]" (*People v. Rivas* (2013) 214 Cal.App.4th 1410, 1425.) "A reviewing court will indulge in a presumption that counsel's performance fell within the wide range of professional competence and that counsel's actions and inactions can be explained as a matter of sound trial strategy. Defendant thus bears the burden of establishing constitutionally inadequate assistance of counsel. [Citations.] If the record on appeal sheds no light on why counsel acted or failed to act in the manner challenged, an appellate claim of ineffective assistance of counsel must be rejected unless counsel was asked for an explanation and failed to provide one, or there simply could be no satisfactory explanation. [Citation.] Otherwise, the claim is more appropriately raised in a petition for writ of habeas corpus. [Citation.]" (*People v. Carter* (2003) 30 Cal.4th 1166, 1211.)

B. The failure to call an expert.

In Leiva's estimation, defense counsel was required to call an expert on eyewitness identification because the case against him hinged upon Arriaga's uncorroborated testimony. He contends that this is a case in which there is no satisfactory explanation for defense counsel's decision and the ineffective assistance claim can be resolved on appeal.

We reject Leiva's contention.

The decision to call "certain witnesses is . . . a matter of trial tactics, unless the decision results from unreasonable failure to investigate. [Citation.]" (*People v. Bolin* (1998) 18 Cal.4th 297, 334; *People v. Mitcham* (1992) 1 Cal.4th 1027, 1059 [the decision whether to put on witnesses is a matter of "trial tactics and strategy which a reviewing court generally may not second-guess"].) Beyond the foregoing, and for good reason, our research has failed to unearth any case setting forth a per se rule requiring a defense attorney to call an expert in every case in which eyewitness identification is uncorroborated. (See *People v. Datt* (2010) 185 Cal.App.4th 942, 952.) As stated by our Supreme Court, "[e]xpert testimony on the psychological factors affecting eyewitness identification is often unnecessary." (*People v. Lewis and Oliver* (2006) 39 Cal.4th 970, 995.)

The record suggests that this was a case in which an expert witness regarding eyewitness testimony did not fit with the defense theory and defense counsel therefore reasonably did not call an expert.

On cross-examination, defense counsel questioned Arriaga about inconsistencies in her written statements when she was shown a photographic six pack. At one point, he questioned her about her statement about who "pulled the gun," and about saying that she saw "the [man] on the left" shoot Jimenez even though she did not actually see anyone shoot because she was running away. Defense counsel asked if she was trying to mislead the police, and then he asked, "You were trying to convince the officers that you saw [Jimenez] being shot, correct?" Arriaga said, "I didn't see it[.]" The defense called Barajas to testify that Arriaga first told her that the shooters were two Black guys from Avalon, then she said they were two Hispanic pretty boys who were not gang-related, and then she said that they were two Hispanic "cholos" who were wearing black hoodies.

In closing argument, defense counsel attacked Arriaga's credibility by pointing out the inconsistencies in her story and saying that she lied. He suggested that the jury should believe Barajas. At one point, he stated that Arriaga was "an admitted gang member [who] is inherently untrustworthy." He also stated: "I don't know who [killed Jimenez]. Neither does [Arriaga]. I don't know why [Arriaga] is lying."

19

It is clear to us that defense counsel chose to challenge Arriaga's veracity instead of challenging her identification as honest but unreliable. It would have been inconsistent, and confusing to the jury, for defense counsel to suggest that Arriaga fabricated her story while at the same time she told the truth to the best of her ability but was mistaken. But, ultimately, whether defense counsel provided ineffective assistance cannot be resolved on appeal because "the record sheds no light on whether [defense] counsel's failure [to call an expert] was based upon sound trial tactics or resulted from inexcusable oversight." (*People v. Mitcham, supra,* 1 Cal.4th at p. 1059; *People v. Bolin, supra,* 18 Cal.4th at p. 333 ["To the extent the record on appeal fails to disclose why counsel acted or failed to act in the manner challenged, we will affirm the judgment 'unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation . . .'"].)

Regardless, Leiva cannot demonstrate prejudice. Arriaga identified Leiva as the shooter during the six-pack photographic lineup, at the preliminary hearing and at trial. Further, she testified that she was six or seven feet away from Leiva during their confrontation. The prosecutor presented evidence that Leiva told his wife he did not have a defense, and being in jail was his fault. Also, the prosecutor presented evidence of the kite indicating that Leiva tried to persuade Dominguez to provide false testimony at trial. In our view, evidence of Leiva's guilt was overwhelming and it is not reasonably probable that he would have obtained a more favorable outcome if defense counsel had called an expert.

C. The failure to object based on the secondary evidence rule.

As previously indicated, the secondary evidence rule was not a bar to the admissibility of the deputy sheriff's interpretation of the meaning of the kite. Thus, defense counsel did not underperform vis-a-vis his failure to raise the objection, and Leiva was not deprived of adequate representation.

20

## DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS.


_____, J.
　　　　　　ASHMANN-GERST


We concur:


_____, P. J.
　　　BOREN


_____, J.[*]
　　　FERNS

---

[*]　Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.